Klos Constr., Inc. v. Premier Homes & Props., LLC, 2020 NCBC 53.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

KLOS CONSTRUCTION, INC.,
Individually and on behalf of
PREMIER HOMES AND
PROPERTIES, LLC,

 Plaintiff,

v.

PREMIER HOMES AND
PROPERTIES, LLC; ALPAT
PROPERTIES, LLC; COASTAL
COSMETIC SURGERY
MARKETING, LLC; KEY MARCO
CONSULTING AND MARKETING,
INC.; ROBERT WEINBACH;
AFTEW PROPERTIES, LLC; AND
PREMIER HOMES AND
COMMUNITIES, LLC, TERRANCE
ANDO, and T. ANDO
CONSTRUCTION & CONSULTING,
INC.,

 Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
18 CVS 3078

**ORDER AND OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Plaintiff Klos Construction, Inc.'s

Motion for Summary Judgment ("Plaintiff's Motion," ECF No. 61), and Defendants

Premier Homes and Properties, LLC; Key Marco Consulting and Marketing, Inc.;

Robert Weinbach, Premier Homes and Communities, LLC; Terrance Ando; and T.

Ando Construction & Consulting, Inc.'s (collectively referred to as "Defendants")

Motion for Summary Judgment ("Defendants' Motion," ECF No. 63; collectively, the

Plaintiff's Motion and the Defendants' Motion are referred to as the "Motions").

THE COURT, having considered the Motions, the evidentiary materials filed

by the parties, the briefs in support of and in opposition to the Motions, the arguments

of counsel at the hearing on the Motions, and other appropriate matters of record, concludes that the Plaintiff's Motion should be DENIED, and the Defendants' Motion should be GRANTED, in part, and DENIED, in part, for the reasons and in the manner set forth below.

*Shipman & Wright, LLP, by Gary K. Shipman, for Klos Construction Inc.*

*Crossley McIntosh Collier Hanley & Edes, PLLC, by Andrew Penny for Premier Homes and Properties, Key Marco Consulting and Marketing, Inc., Robert Weinbach, Premier Homes and Communities, LLC, Terrance Ando, and T. Ando Construction & Consulting, Inc.*

McGuire, Judge.

## I. FACTS

### A. *Premier Homes and Properties, LLC and Motts Landing*

1. "The Court does not make findings of fact when ruling upon a motion for summary judgment. But[,] to provide context for its ruling, the Court may state either those facts that it believes are not in material dispute or those facts on which a material dispute forecloses summary adjudication." *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017).

2. Plaintiff Klos Construction, Inc. ("Plaintiff") is a North Carolina corporation with its principal place of business in New Hanover County, North Carolina. ("Verified Complaint," ECF No. 3, at ¶ 4.) Plaintiff is a general contractor in the business of building custom and spec homes in southeastern North Carolina. (*Id.* at ¶ 17.) Christopher Klos ("Klos") is the president of Plaintiff. (Klos Dep., ECF No. 62.19, at p. 17.)

3.     Defendant Key Marco Consulting and Marketing Inc. ("Key Marco") is a Florida corporation with its principal place of business in Collier County, Florida. (ECF No. 3, at ¶ 9.)  Key Marco is in the sales and marketing business and was formed "[t]o conduct business in real estate consulting and to do real estate projects in . . . North Carolina."  (*Id.* at ¶ 16; Weinbach Dep., ECF No. 62.3, at p. 9.)  Defendant Robert Weinbach ("Weinbach") is the sole shareholder and officer of Key Marco.  (ECF No. 62.3, at p. 10.)

4.     Defendant Alpat Properties, LLC ("Alpat") is a North Carolina limited liability company with its principal place of business in Lenoir County, North Carolina.  (ECF No. 3, at ¶ 7.)  Alpat is in the business of investing in real estate in southeastern North Carolina.  (*Id.* at ¶ 18.)  Dr. Richard E. Cummings ("Dr. Cummings") is a representative of Alpat.

5.     In the latter part of 2008, Weinbach and Klos discussed with Dr. Arnold Sobol ("Dr. Sobol"), the owner of Defendant Aftew Properties, LLC ("Aftew"), the building, marketing, and selling of residential homes in a development owned by Aftew called The Village at Motts Landing ("Motts Landing") near Wilmington, North Carolina.  (Weinbach Dep., ECF No. 62.3, at pp. 19–21; Sobol Dep., ECF No. 62.5, at pp. 15–16.)  Subsequent to the conversations with Dr. Sobol, in 2009 Premier Homes and Properties, LLC ("PHP") was formed as a member-managed limited liability company with Plaintiff, Key Marco, and Alpat as its members.  (Weinbach Dep., ECF

No. 62.3, at pp. 19–20; "PHP Operating Agreement," ECF No. 62.2, at pp. 26–27.)[1] Each member of PHP owns an equal one-third share of the company. (*Id.*)

6. Pursuant to the PHP Operating Agreement, each of the members "shall serve as [m]anagers by virtue of their status as [m]embers." (ECF No. 62.2, at p. 4.) Additionally, the PHP Operating Agreement defines "Act" as "the North Carolina Limited Liability Company Act, as the same may be amended from time to time," (*Id.* at p. 1), and contains the following provision governing PHP member and manager liability relevant to this dispute:

> 7.1 Limitation of Liability. No Manager or Member of the Company shall be liable to the Company or its Members for monetary damages for an act or omission in such person's capacity as a Manager or a Member, except as provided in the Act with regard to: (I) acts or omissions which a Manager knew at the time of the acts or omissions that the acts or omissions were clearly in conflict with the interests of the Company, (ii) any transaction from which a Manager derived an improper personal benefit, or (iii) acts or omissions occurring prior to the date this provision becomes effective. If the Act is amended to authorize action further eliminating or limiting the liability of Managers and Members, then the liability of a Manager or Member of the Company shall be eliminated or limited to the fullest extent permitted by the Act as so amended. Any repeal or modification of this section shall not adversely affect the right or protection of a Manager or Member existing at the time of such repeal or modification.

("Article 7.1," ECF No. 62.2, at p. 9.) The PHP Operating Agreement also provides members, managers, and other related parties with broad authority to engage in other business ventures in direct competition with PHP:

---

[1] Klos signed the PHP Operating Agreement on behalf of Plaintiff; Weinbach signed the PHP Operating Agreement on behalf of Key Marco; and Dr. Cummings signed the PHP Operating Agreement on behalf of Alpat.

12.1 Competing Business. Except as otherwise expressly provided in this Agreement or the Act, neither the Managers nor the Members, nor any of their shareholders, directors, officers, employees, partners, agents, family Members or affiliates, shall be prohibited or restricted in any way from investing in or conducting, either directly or indirectly, and may invest in and/or conduct, either directly or indirectly, businesses of any nature whatsoever, including the ownership and operation of a business or properties similar to or in the same geographical area as those held by the Company. Except as otherwise provided in this agreement or the Act, any investment in or conduct of any such businesses by any such person or entity shall not give rise to any claim for any accounting by any Member or the Company or any right to claim any interest therein or the profits therefrom, or any claim for diversion of Company opportunity or breach of any duty to the Company arising from status as Member or Manager.

("Article 12.1," ECF No. 62.2, at 23.)

7.    Although not members of PHP, Defendant T. Ando Construction & Consulting, Inc. ("T. Ando Construction") served as the "sales manager" for PHP and Terrance Ando ("Ando"), a co-owner of T. Ando Construction and licensed real estate agent, assumed the role as "broker-in-charge" for PHP.  (Ando Dep., ECF No. 67.3, at pp. 14, 19–21.)

8.    It is undisputed that PHP was formed for the purpose of building, marketing, and selling homes in Motts Landing.  (Weinbach Dep., ECF No. 62.3, at p. 20.)  At the time of PHP's formation, it was understood that Alpat would provide funding, Key Marco would oversee the marketing of Motts Landing, and Plaintiff would handle the construction of the homes in Motts Landing.  (Weinbach Dep., ECF No. 62.3, at pp. 20–21.)

9. On June 8, 2009, PHP entered into a sales and marketing contract with Aftew under which PHP became the exclusive sales, marketing, and construction group for Motts Landing. ("2009 Motts Landing Contract," ECF No. 62.4; ECF No. 67.5.) The 2009 Motts Landing Contract had an initial term of thirty months. (*Id.* at p. 21.) Thereafter, the 2009 Motts Landing Contract was periodically amended, expanded, and extended. (Sobol Dep. ECF No. 62.5, at pp. 42–44; "Amendments," ECF Nos. 62.6, 62.7, 62.8.) On July 28, 2014, PHP and Aftew entered into a renewal sales and marketing contract which added new terms and extended PHP's right to build, sell, and market homes in Motts Landing through December 31, 2015. ("2014 Renewal," ECF No. 62.9.)

### B. Formation of Premier Homes and Communities, LLC

10. While PHP was performing under the 2009 Motts Landing Contract, Weinbach and Ando formed two companies, in 2011 and 2013 respectively, to build homes in residential communities similar to Motts Landing in southeastern North Carolina. (Weinbach Dep., ECF No. 63.2, at pp. 24–28.) Klos evidently attempted to join Weinbach and Ando's other companies. However, Weinbach declined to let Klos join the companies because Weinbach did not believe Klos could handle anything beyond the work at Motts Landing. (*Id.* at p. 26.) Weinbach maintains that as construction increased in Motts Landing, Klos had trouble meeting PHP and customer expectations. (*Id.* at pp. 33–36.) While Klos disputes Weinbach's assertions, for one reason or another, as the amount of homes that PHP constructed

increased, additional contractors were hired to build homes in Motts Landing. (Klos Dep., ECF No. 62.19, at pp. 140–46.)

11. In April 2015, Weinbach and Ando formed a new company, Premier Homes and Communities, LLC ("Communities"), with Key Marco and T. Ando Construction as its two equal (50%) owners and members. (Communities Art. of Inc., ECF No. 62.10; Communities Operating Agreement, ECF No 62.11.) Ando and Weinbach formed Communities for the purpose of potentially continuing the development of Motts Landing and "doing new projects in different markets or different communities." (Ando Dep. ECF No. 62.12, at pp. 29, 32–34; Weinbach Dep. ECF No. 62.3, at p. 28.)

12. Weinbach maintains that prior to the formation of Communities, Weinbach made Klos aware that he was forming a new company as a "safety valve" to complete Motts Landing if Klos could not meet expectations. (Weinbach Dep., ECF No. 62.3, at pp. 28–29.) Klos disputes that his performance was ever considered unsatisfactory and proffers multiple letters of recommendation written for Klos by Motts Landing customers. (Klos Dep., ECF No. 62.19, at pp. 116–32; "Letters of Recommendation," ECF No. 70.2.) The letters appear to praise Klos for communicating promptly and completing homes in a timely fashion. (*See* ECF No. 70.2.)

### C. Contract Between Aftew and Communities (the "Communities Contract")

13. On May 19, 2015, Communities and Aftew reached a working agreement drafted by Weinbach. ("Working Agreement," ECF No. 62.13; Weinbach

Dep., ECF No. 62.3, at p. 103.) Plaintiff represents, and Defendants do not dispute, that the Working Agreement identifies properties that Communities would "purchase from Aftew for construction and sale between July 1, 2015, and July 1, 2016[,]" although some of the lots referenced in the Working Agreement were already under contract for sale to PHP customers. (*Id.*; ECF No. 62, at pp. 4–5; Ando Dep., ECF No 62.12, at pp. 50–51.) While negotiating the terms of the Working Agreement, Dr. Sobol understood it to be an extension of the 2009 Motts Landing Contract and was not informed that Communities was a different company than PHP. (ECF No. 62.5, at pp. 31–34.)

14.     On June 5, 2015, Ando engaged in an email correspondence with an individual in Aftew's attorney's office, stating that certain revisions needed to be made to an attached document. ("Email Chain," ECF No. 62.14.)[2] In the signature block of this email, Ando represents himself as being affiliated with PHP. (*Id.*) The attached document referenced in the Email Chain is entitled "Third Amendment to Village at Motts Landing Sales and Marketing Contract." ("Third Amendment," ECF No. 62.16.) The Third Amendment was drafted as if it was to be executed between PHP and Aftew, containing a signature block for Aftew with Dr. Sobol as its representative and a signature block for PHP with Plaintiff as its representative. (*See id.*) Indeed, the Third Amendment was already signed by Dr. Sobol on behalf of Aftew, and Ando had already signed the document under PHP's signature block. (*Id.*)

---

[2] These emails are the subject of the Court's Order on Plaintiff's Motion for Sanctions. (Ord. on Mot. for Sanc., ECF No. 58.)

15. The Third Amendment also contains the following handwritten revisions: (1) each time the Third Amendment references "Premier Homes and Properties, LLC," "Properties" is crossed out and "Communities" is handwritten in its place; (2) in the signature block for Aftew, Dr. Sobol's middle initial is changed; and (3) in the signature block for PHP, the printed name "Klos Construction, Inc. (Member/Manager)" is crossed out and replaced with "Terry Ando – managing partner." (*Id.*) The record does not reflect whether the handwritten revisions were written on the Third Amendment before or after Dr. Sobol signed the document. Aftew's attorney's office returned the Third Amendment with the requested revisions. (ECF No. 62.14; *see also* "Revised Third Amendment," ECF No. 62.17.)

16. On June 8, 2015, Communities and Aftew executed the Revised Third Amendment. ("Communities Contract," ECF No. 67.8.) The Communities Contract specifically references the 2009 Motts Landing Contract, and states that it is extending the 2009 Motts Landing Contract through June 30, 2016. (*Id.*) However, the Communities Contract unambiguously states that Communities, and not PHP, shall have the right to purchase a certain number of lots in Motts Landing. (*Id.*)

17. Ando concedes that he did not expressly inform Klos about the Communities Contract, nor did Ando give Klos a copy of the document prior to, or near the time of its execution. (Ando Dep., ECF No. 62.12, at pp. 65–66.) Aside from this concession from Ando, the record is unclear and fails to establish what exactly Klos and PHP knew with regard to the consummation of the Communities Contract, or when they became aware of the Communities Contract.

18.     Nevertheless, on July 1, 2015, Ando became the broker in charge for Communities and Communities began constructing homes at Motts Landing. (Weinbach Dep., ECF No. 62.3, at pp. 12–13.)  Construction that PHP had already initiated prior to July 1, 2015, was carried out in the name of PHP, and PHP had closings through the end of 2015.  (*Id.*)  However, after July 1, 2015, any new development in Motts Landing was facilitated by Communities and not PHP.  (*Id.*)  The last home that Klos personally oversaw construction on in Motts Landing, from beginning to end, was sometime in August 2015.  (Klos Dep., ECF No. 62.19, at pp. 53–54.)

### D. Klos's Knowledge of Communities

19.     The record in support of the Motions fails to demonstrate what Klos knew with regard to Communities prior to its formation.  Likewise, the Court cannot discern when Klos had actual knowledge that Communities existed.  Klos's testimony on this point is simply all over the board.  Klos admits that in late September 2015, Dr. Sobol provided Klos with a copy of the Communities Contract.  (Klos Dep., 62.19, at pp. 35–37.)  Klos also testifies that he may have talked to Weinbach about Communities at some point in December 2015, but then claims that he was unaware of Communities until March 2016.  (Klos Dep., ECF No. 62.19, at pp. 38, 184.)  Accordingly, the record fails to clearly establish what and when Klos knew about Communities.

### E. Dissolution and Subsequent Reestablishment of PHP

20.     In the fall of 2015, Weinbach told Klos that he wanted to discuss the dissolution of PHP.   (*See* Weinbach Dep., ECF 62.3, at pp. 56–59.)   Klos's understanding of, and agreement to, the dissolution of PHP is yet another question left open by the record in this case.  In a correspondence sent on September 22, 2015 from Klos to Weinbach, Klos expressed, regretfully, a willingness to dissolve PHP on December 31, 2015, subject to certain conditions.  (Correspondence, ECF 62.18; Klos Dep., ECF 62.9, at pp. 178–82.)

21.     Sometime in late September 2019, the members of PHP met to discuss the dissolution and winding up of PHP.  (Weinbach Dep., ECF No. 62.3, at pp. 59–71.)  What the members of PHP, other than Weinbach, knew about Communities and the Communities Contract at this meeting is wholly unclear.  (Cummings Dep., ECF No. 62.20, at pp. 28–30; Klos Dep., 62.19, at pp. 35–37, 100, 219.)  Moreover, there is conflicting testimony regarding what was said and what action was taken at this meeting.  (Klos Dep., ECF No. 62.19, at pp. 51, 184; Weinbach Dep., ECF No. 62.3, at pp. 59–72; Cummings Dep., ECF No. 62.20, at pp. 25–29.)

22.     In early December 2015, Klos and Weinbach met again to discuss the dissolution of PHP.  Weinbach subsequently executed and filed Articles of Dissolution for PHP.  (Weinbach Dep., ECF No. 62.3, at pp. 73–76; Art. of Diss., ECF No. 62.23.)  Again, Klos's knowledge of Communities and understanding of the Communities Contract at the time of this final meeting, and whether he ultimately agreed to dissolve PHP, cannot be determined on this record.

23. On April 22, 2016, Klos filed Articles of Correction with the North Carolina Secretary of State, stating that Key Marco improperly filed the Articles of Dissolution without the unanimous consent of the members of PHP. (Art. of Correc., ECF No. 62.24.)

## II. PROCEDURAL BACKGROUND

24. On February 17, 2017, Klos sent a letter, *inter alia*, to Key Marco, Alpat, and PHP, demanding that PHP file suit against Key Marco, Weinbach, Aftew, and PHP based on Communities' alleged violation of PHP's rights. (February 17, 2017 Letter, ECF No. 53.2.) On July 5, 2017, Klos filed suit derivatively on behalf of PHP against PHP, Alpat, Key Marco, Weinbach, Aftew, and Communities (17 CVS 2574) ("2017 Lawsuit").[3] On March 28, 2018, Klos voluntarily dismissed the 2017 Lawsuit without prejudice. In February and March 2018, Klos sent two additional derivative demand letters to PHP. (February 8, 2018 and March 5, 2018 Letters, ECF No. 53.2.) In those letters, Klos, *inter alia*, demanded that PHP bring legal claims against Ando and T. Ando Construction, and additional claims against Key Marco and Weinbach, and against PHP. (*Id.*)

25. On August 28, 2018, Plaintiff filed a new complaint making derivative claims against Weinbach, Key Marco, Ando, T. Ando Construction, and Communities for: Conversion ("First Cause of Action"), Unjust Enrichment ("Second Cause of Action"), Tortious Interference with Contractual Relations and Prospective Economic Advantage ("Third Cause of Action"), Fraud ("Ninth Cause of Action"), Punitive

---

[3] Plaintiff also sued Coastal Cosmetic Surgery Marketing, LLC.

Damages ("Tenth Cause of Action"), and Civil Conspiracy ("Eleventh Cause of Action"). (ECF No. 3.) Plaintiff asserts claims against Weinbach, Key Marco, and Ando for Breach of Fiduciary Duties ("Fourth Cause of Action"), Constructive Fraud ("Fifth Cause of Action"), and a claim against Weinbach and Key Marco for Breach of Implied Covenant of Good Faith and Fair Dealing ("Sixth Cause of Action"). Plaintiff also asserts a claim against Weinbach and Ando for Piercing the Corporate Veil ("Twelfth Cause of Action"). (*Id.*) Finally, Plaintiff makes claims for an Accounting of PHP's financial records from 2015 to present ("Seventh Cause of Action"), and Judicial Dissolution of PHP ("Eighth Cause of Action"). (*Id.*)

26.     On August 30, 2018, this action was designated to the North Carolina Business Court and assigned to the undersigned. (Designation Order, ECF No. 1; Assignment Order, ECF No. 2.) On April 22, 2019, Plaintiff filed a voluntary dismissal with prejudice of its First Cause of Action for conversion. (Vol. Dis., ECF No. 27.)

27.     On January 2, 2020, Plaintiff filed the Plaintiff's Motion along with a brief and evidence in support. (ECF No. 61; Pl.'s Br. in Supp., ECF No 62; Pl.'s Evid. in Supp., ECF Nos. 62.1–62.42.) The Plaintiff's Motion seeks summary judgment only on Plaintiff's claims for "Tortious Interference with Contractual Relations and Prospective Economic Advantage, Breach of Fiduciary Duties, Constructive Fraud, Breach of the Implied Covenant of Good Faith and Fair Dealing, Fraud, and Civil Conspiracy, and entry of an Order awarding the Plaintiff $6,753,389.00 in compensatory damages." (ECF No. 61.)

28. On January 17, 2020, Defendants filed the Defendants' Motion along with a brief and evidence in support. (ECF No. 63; Defs.' Br. in Supp., ECF No. 64; Defs.' Evid. in Supp., ECF Nos. 64.1–64.19.) The Defendants' Motion seeks summary judgment in their favor on all claims alleged by Plaintiff. (ECF No. 63.) Despite purporting to move for summary judgment on all of Plaintiff's claims, Defendants make no argument with respect to Plaintiff's claims for: an Accounting, Judicial Dissolution, or Piercing the Corporate Veil. Accordingly, to the extent the Defendants' Motion seeks summary judgment on Plaintiff's claims for an Accounting, Judicial Dissolution, and Piercing the Corporate Veil, the Defendants' Motion is DENIED.

29. On January 31, 2020, Defendants filed a brief in opposition to Plaintiff's Motion, along with multiple evidentiary materials. (Defs.' Br. in Opp., ECF No. 67; Defs.' Evid. in Opp., ECF Nos. 67.1–67.22.) On February 10, 2020, Plaintiff filed a reply brief in support of the Plaintiff's Motion. (Pl.'s Reply Br., ECF No. 68.) On February 14, 2020, Plaintiff filed a brief in opposition to Defendants' Motion and multiple evidentiary materials. (Pl.'s Br. in Opp., ECF No. 70; Pl.'s Evid. in Opp., ECF Nos. 70.1–70.2.) On February 24, 2020, Defendants filed a reply brief in support of the Defendants' Motion. (Defs.' Reply Br., ECF No. 71.)

30. This matter came before the Court for a hearing, and the Court heard oral argument from counsel. The Motions, having been fully brief and argued, are now ripe for decision.

## III.  ANALYSIS

### A. *Standard of Review*

31.  "Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to judgment as a matter of law.'" *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c)).  The moving party bears the burden of presenting evidence which shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  *Hensley v. Nat'l Freight Transp., Inc.*, 193 N.C. App. 561, 563, 668 S.E.2d 349, 351 (2008).  Where the moving party is the defendant, they may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would have been barred by an affirmative defense." *Variety Wholesalers, Inc.*, 365 N.C. at 523, 723 S.E.2d at 747.  An issue is "material" if "resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972).  "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000).

32.  "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85,

534 S.E.2d 660, 664 (2000). As recently reiterated by the North Carolina Court of Appeals, the burden on the non-movant goes beyond merely producing some evidence or a scintilla of evidence in support of its claims. Rather,

> If the movant meets this burden, the nonmovant must take affirmative steps to set forth specific facts showing the existence of a genuine issue of material fact. An adverse party may not rest upon the mere allegations or denials of his pleading. A genuine issue of material fact is one that can be maintained by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference.

*Khashman v. Khashman*, No. COA16-765, 2017 N.C. App. LEXIS 715, at \*15 (N.C. Ct. App. Sept. 5, 2017) (citations and internal quotation marks and modifiers omitted).

### B. Cosmetic Surgery Marketing and Consulting Marketing Inc. ("CSMC"), Alpat, and Aftew Should be Dismissed.

33. As a preliminary matter, the Court notes that the Verified Complaint contains no claims against Defendants CSMC, Alpat, and Aftew or any explanation for their presence as named Defendants in this lawsuit, and neither party makes any argument regarding claims directed at these parties. Accordingly, the Court concludes that CSMC, Alpat, and Aftew should be DISMISSED from this lawsuit without prejudice.

### C. Fiduciary Duties

34. The parties devote much of their briefing to arguing whether Weinbach and Key Marco owed fiduciary duties to PHP. Plaintiff contends that "Weinbach and Key Marco . . ., as managers of PHP, [ ] owed the company fiduciary duties of trust,

loyalty, due care, good faith, and fair dealing." (ECF No. 62, at p. 20.) On the other hand, Defendants argue that the PHP Operating Agreement waived the managers' duty of loyalty and limits PHP managers' liability. (ECF No. 67, at .pdf pp. 8–11.) Accordingly, the Court first considers Plaintiff's contention that Weinbach, individually, and Key Marco owed PHP fiduciary duties.

i. Weinbach

35. It is undisputed that Weinbach is not a member of PHP and is not named a manager in the PHP Operating Agreement. There is no evidence that the members of PHP ever took the steps required by the PHP Operating Agreement to make Weinbach a manager. (*See* ECF No. 62.2, at p. 5.)

36. Nevertheless, Weinbach signed the PHP Operating Agreement on behalf of Key Marco. Plaintiff contends that by operation of Section 3.2 of the PHP Operating Agreement, "Weinbach became a manager of PHP by executing the Operating Agreement on behalf of [Key Marco]." (ECF No. 62, at p. 21; *see* "Section 3.2," ECF No. 62.2, at pp. 4–5.) The Court disagrees. Section 3.2 of the PHP Operating Agreement merely provides that a PHP member who is not a natural person, "shall designate a natural person who is authorized to act on behalf of such Member in it its capacity as Manager" and that said natural person's signature on the PHP Operating Agreement equates to a designation. (ECF No. 62.2, at pp. 4–5.) Nothing in Section 3.2 expressly provides that the designee of a non-person member individually becomes a manager by accepting the designation. (*See id*.) Rather, Weinbach is merely Key Marco's designee.

37. Weinbach, individually, was not a member or manager of PHP and did not owe fiduciary duties to PHP. Therefore, to the extent the Defendants' Motion and Plaintiff's Motion seek summary judgment on Plaintiff's claims against Weinbach for breach of fiduciary duty and constructive fraud, the Defendants' Motion should be GRANTED, and the Plaintiff's Motion should be DENIED.

   ii. Key Marco

38. Key Marco was a manager of PHP, and, unless altered by the PHP Operating Agreement, ordinarily would owe PHP fiduciary duties. N.C.G.S. § 57D-3-21(b) ("Each manager shall discharge that person's duties (i) in good faith, (ii) with the care an ordinary prudent person in a like position would exercise under similar circumstances, and (iii) *subject to the operating agreement*, in a manner the manager believes to be in the best interests of the LLC." (emphasis added)). "Indeed, 'the provisions of [the LLC Act] and common law will apply only to the extent contrary or inconsistent provisions are not made in, or not otherwise supplanted, varied, disclaimed, or nullified by, the operating agreement.'" *Plasman v. Decca Furniture (USA), Inc.*, 2016 NCBC LEXIS 80, at *36 (N.C. Super. Ct. Oct. 21, 2016) (citing N.C.G.S. § 57D-2-30(a)). An LLC manager's duty of loyalty to act in the best interest of the LLC is specifically "subject to the operating agreement." N.C.G.S. § 57D-3-21(b)(iii); *Plasman,* 2016 NCBC LEXIS 80, at *36; *Pender Farm Dev. v. NDCO,* 2018 NCBC LEXIS 189, at *38 (N.C. Super. Ct. Mar. 12, 2018); *see also Vanguard Pai Lung, LLC v. Moody,* 2019 NCBC LEXIS 39, at *17–18 (N.C. Super. Ct. June 19, 2019) ("Because an LLC is primarily a creature of contract, the members are

generally free to arrange their relationship however they wish. Among other things, they may depart from statutory default rules, require supermajority votes for some or all company matters, and impose or eliminate fiduciary duties for members and managers." (internal citations and quotation marks omitted)).

39.     Defendants argue that Article 7.1 of the PHP Operating Agreement, read in light of the current Act, eliminates Key Marco's fiduciary duty of loyalty to PHP. Article 7.1 provides, in relevant part, as follows:

> 7.1 Limitation of Liability. No Manager or Member of the Company shall be liable to the Company or its Members for monetary damages for an act or omission in such person's capacity as a Manager or a Member, except as provided in the Act with regard to: (I) acts or omissions which a Manager knew at the time of the acts or omissions that the acts or omissions were clearly in conflict with the interests of the Company, (ii) any transaction from which a Manager derived an improper personal benefit, or (iii) acts or omissions occurring prior to the date this provision becomes effective. If the Act is amended to authorize action further eliminating or limiting the liability of Managers and Members, then the liability of a Manager or Member of the Company shall be eliminated or limited to the fullest extent permitted by the Act as so amended.

(ECF No. 62.2, at p. 9.)  Defendants contend that Article 7.1 "expressly provides for the limitation of liability of its managers to the fullest extent permitted by the current LLC Act.  This constitutes a full waiver of any duty because [the current version of the Act] allows a complete [ ] limitation of liability."  (ECF No. 64, at .pdf pp. 7–10.)

40.     In response, Plaintiff argues that Key Marco continues to have fiduciary obligations to PHP because nothing in the PHP Operating Agreement "permits Weinbach/Key Marco, while a Manager of PHP, to divert PHP's business

opportunities and prospective economic advantage to Communities, and no part of 'the Act' as it existed at the time of the execution of the [PHP] Operating Agreement . . . or as it exists today authorizes such conduct." (ECF No. 70, at p. 13.)[4]

41. "An operating agreement is a contract[,]" and should be interpreted under North Carolina's established rules of contract construction. *N.C. State Bar v. Merrell,* 243 N.C. App. 356, 370, 777 S.E.2d 103, 114 (2015). "With all contracts, the goal of construction is to arrive at the intent of the parties when the contract was issued. The intent of the parties may be derived from the language in the contract." *Bank of Am., N.A. v. Rice,* 230 N.C. App. 450, 456, 750 S.E.2d 205, 209 (2013) (quotation omitted); *see also Lane v. Scarborough,* 284 N.C. 407, 409–10, 200 S.E.2d 622, 624 (1973) ("Whenever a court is called upon to interpret a contract its primary purpose is to ascertain the intention of the parties at the moment of its execution."). The intention of the parties "is to be ascertained from the expressions used, the subject matter, the end in view, the purpose sought, and the situation of the parties at the time." *Lane,* 284 N.C. at 410, 200 S.E.2d at 624 (quoting *Electric Co. v. Ins. Co.,* 229 N.C. 518, 520, 50 S.E.2d 295, 297 (1948)).

42. In analyzing the intent of the parties "[t]he court must construe the contract as a whole and [its provisions] must be appraised in relation to all other provisions." *Schenkel & Shultz, Inc. v. Hermon F. Fox & Assocs., P.C.,* 362 N.C. 269,

---

[4] Plaintiff is incorrect as to the second point. The current LLC Act "provides that the manager's duty to act in the best interests of the company is "subject to the operating agreement." N.C.G.S. § 57D-3-21(b). "Thus, Chapter 57D permits parties to an operating agreement to waive a manager's duty of loyalty." *Pender Farm Dev.,* 2018 NCBC LEXIS 189, at *38.

273, 658 S.E.2d 918, 921 (2008) (internal quotation omitted). "It is presumed that each part of the contract means something." *Brown v. Lumbermens Mut. Casualty Co.*, 326 N.C. 387, 393, 390 S.E.2d 150, 153 (1990) (citation and quotation marks omitted). "The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect[.]" *Duke Energy Corp. v. Malcolm*, 178 N.C. App. 62, 65, 630 S.E.2d 693, 695 (2006) (quotation omitted).

43. It is well-settled that "[w]here the language of a contract is plain and unambiguous, the construction of the agreement is a matter of law; and the court . . . must construe the contract as written, in light of the undisputed evidence as to the custom, usage, and meaning of its terms." *Happ v. Creep Pointe Homeowner's Assoc.*, 215 N.C. App. 96, 103, 717 S.E.2d 401, 406 (2011) (alterations in original) (quoting *Hodgin v. Brighton*, 196 N.C. App. 126, 128, 674 S.E.2d 444, 446 (2009)). "An ambiguity exists in a contract when either the meaning of words or the effect of provisions is uncertain or capable of several reasonable interpretations." *Schenkel & Shultz, Inc.,* 362 N.C. at 273, 658 S.E.2d at 922 (citation and quotation marks omitted).

44. Defendants argue that the language in Article 7.1 stating "[i]f the Act is amended to authorize action further eliminating or limiting the liability of Managers and Members, then the liability of a Manager or Member of the Company shall be eliminated or limited to the fullest extent permitted by the Act as so amended" automatically limits liability on the part of PHP managers to the fullest extent permitted under the Act without any further action taken by PHP. Conversely,

Plaintiff argues that the language at issue requires PHP to take "action" expanding protection for managers following an amendment of the Act by amending the PHP Operating Agreement to further limit manager liability in accordance with the Act. (ECF No. 68, at pp. 1–6.)

45.     The Court concludes that the language of Article 7.1 is unambiguous on its face and reflects the parties' intent to automatically extend the limitation of liability to the extent the Act permits such limitation.  In other words, the parties intended the broadest limitation on liability permissible under the Act to apply to PHP's managers, including any further limitation that might be permitted by amendment of the Act after the PHP Operating Agreement was executed.

46.     Moreover, Article 12.1 unambiguously gives the parties the right to establish competing businesses for purposes of developing commercial real estate, and to take any new opportunities for themselves and the new business.  While not a waiver of fiduciary duty itself, when read in tandem with Article 7.1, Article 12.1 provides further support for the conclusion that the parties to the PHP Operating Agreement sought to afford PHP managers the greatest limitation on liability for claims of diversion of corporate opportunities.

47.     Having determined the meaning and intent behind Article 7.1, the Court will now address the impact of the General Assembly's 2014 amendment to the Act. When the PHP Operating Agreement was executed, it allowed for the greatest possible limitation of liability under the then existing version of the Act, Chapter 57C. Chapter 57C, and specifically section 57C-3-32(b), did not allow the terms of an

operating agreement to limit or eliminate a manager's duty of loyalty. However, effective January 1, 2014, the General Assembly repealed Chapter 57C and replaced it with a new version of the Act, Chapter 57D. N.C.G.S. § 57D-1-01, et seq. Under Chapter 57D, an LLC manager's duty of loyalty is "subject to the operating agreement." N.C.G.S. § 57D-3-21(b)(iii). Accordingly, unlike the prior version of the Act, "Chapter 57D permits parties to an operating agreement to waive a manager's duty of loyalty." *Pender Farm Dev.,* 2018 NCBC LEXIS 189, at *38; *see also Plasman,* 2016 NCBC LEXIS 80, at *36.

48.    Accordingly, since the execution of the PHP Operating Agreement, the Act has been "amended to authorize action further eliminating or limiting the liability of Managers" by way of allowing an operating agreement to waive an LLC manager's duty of loyalty. The Court concludes that, in response to Chapter 57D taking effect, Article 7.1 automatically amended the PHP Operating Agreement, and the PHP managers' duty of loyalty was waived. Therefore, Key Marco does not owe PHP the fiduciary duty of loyalty.

49.    Having determined that Key Marco does not owe PHP the fiduciary duty of loyalty, the Court will now address Plaintiff's claims for breach of fiduciary duty and constructive fraud against Key Marco. The Court will then address Plaintiff's claim for breach of the implied covenant of good faith and fair dealing against Weinbach and Key Marco. Plaintiff's claims against Weinbach and Key Marco for fraud, tortious interference, and unjust enrichment will be addressed *infra.*

a) <u>Breach of Fiduciary Duty and Constructive Fraud</u>

50.     In its Fourth Cause of Action, Plaintiff alleges a claim against Key Marco for breach of fiduciary duty. (ECF No. 3, at ¶¶ 90–97.) In its Fifth Cause of Action, Plaintiff asserts a claim against Key Marco for constructive fraud. (*Id.* at ¶¶ 99–102.)

51.     To establish a claim for breach of fiduciary duty or constructive fraud, a plaintiff must first establish that the defendant(s) owed the plaintiff a fiduciary duty. *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (citations omitted) ("For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties."); *Crumley & Assocs., P.C. v. Charles Peed & Assocs., P.A.*, 219 N.C. App. 615, 620, 730 S.E.2d 763, 767 (2012) ("To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction.").

52.     Plaintiff's claims against Key Marco for breach of fiduciary duty and constructive fraud are rooted in Key Marco's alleged breach of the fiduciary duty of loyalty and usurpation of PHP's corporate opportunities. (*See* ECF No. 3, at ¶¶ 90–102.) The Court has determined that Article 7.1 waives the fiduciary duty of loyalty for PHP managers. Therefore, Plaintiff cannot establish that Key Marco breached the fiduciary a duty of loyalty to PHP by diverting PHP's corporate opportunities to Communities.

53.   Therefore, to the extent Defendants' Motion and Plaintiff's Motion seek summary judgment on Plaintiff's claims against Key Marco for breach of fiduciary duty and constructive fraud, the Defendants' Motion should be GRANTED, and the Plaintiff's Motion should be DENIED.

b) <u>Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

54.   For Plaintiff's Sixth Cause of Action, Plaintiff asserts a claim against Weinbach and Key Marco for breach of the implied covenant of good faith and fair dealing.  (ECF No. 3, at ¶¶ 104–05.)

55.   Pursuant to the Act, "the laws of agency and contract, including the implied contractual covenant of good faith and fair dealing . . . govern the administration and enforcement of operating agreements."  N.C.G.S. § 57D-2-30(e). Under North Carolina law, every enforceable contract contains an underlying, implied covenant of good faith and fair dealing.  *Bicycle Transit Auth. v. Bell,* 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985).  "A claim for breach of this implied covenant arises when one party 'wrongfully deprives' the other of some benefit 'to which they were entitled,' or takes some other action for a 'wrongful or unconscionable purpose.'"  *Wadhwania v. Wake Forest Univ. Baptist Med. Ctr.*, No. COA18-252, 2018 N.C. App. LEXIS 1100, at *8 (N.C. Ct. App. Nov. 20, 2018) (citing *Dull v. Mut. Of Omaha Ins. Co.*, 85 N.C. App. 310, 318, 354 S.E.2d 752, 757 (1987)).

> In addition to its express terms, a contract contains all terms that are necessarily implied "to effect the intention of the parties" and which are not in conflict with the express terms. *Lane v. Scarborough*, 284 N.C. 407, 410, 200 S.E.2d 622, 624 (1973) (citations omitted). Among these implied terms is the "basic principle of contract law

that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Weyerhaeuser Co. v. Building Supply Co.*, 40 N.C. App. 743, 746, 253 S.E.2d 625, 627 (1979) (citations omitted). All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose. *Id.*

*Maglione v. Aegis Family Health Ctrs.,* 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005).

56.     Plaintiff alleges that Weinbach and Key Marco, "as a party [sic] to the PHP Operating Agreement, owed PHP an implied covenant of good faith and fair dealing . . . [and their] actions constitute a breach of the implied covenant." (ECF No. 3, at ¶ 104.) Plaintiff argues that "[b]y causing Communities to step into PHP's contractual shoes, Key Marco and Weinbach, PHP's managers, breached their obligation to perform their contractual obligations to PHP in good faith." (ECF No. 62, at p. 23.)

57.     The Court notes that, contrary to Plaintiff's position, Weinbach is not a party to the PHP Operating Agreement and merely signed the PHP Operating Agreement as the designee for Key Marco pursuant to Section 3.2. The Court also has already concluded that Weinbach is not a member of PHP and there is no evidence that Weinbach became a manager of PHP. Finally, Plaintiff does not cite to, and the Court is not aware of, any authority for the proposition that signing an operating agreement on behalf of a non-person entity automatically imposes the contractual implied covenant of good faith and fair dealing on said signatory. Therefore, to the

extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claim against Weinbach for breach of the implied covenant of good faith and fair dealing, the Defendants' Motion should be GRANTED, and the Plaintiff's Motion should be DENIED.

58. Defendants argue that the claim for breach of the covenant of good faith and fair dealing must be dismissed because the PHP Operating Agreement waived the duty of loyalty and allowed Key Marco to engage in competition with, and usurp the corporate opportunities of, PHP. In other words, Defendants contend that since the contract expressly allows the allegedly breaching conduct, it cannot constitute a breach of a duty of good faith. (ECF No. 64 at .pdf p. 12; ECF No. 67, at .pdf p. 15.)

59. The waiver of the fiduciary duty of loyalty in the PHP Operating Agreement has no effect on the implied covenant of good faith and fair dealing. "The implied contractual covenant of good faith and fair dealing should not be confused with the fiduciary duty of good faith that is one of the managers' duties under [N.C.G.S. §] 57D-3-21." 1 Russell M. Robinson II, Robinson on North Carolina Corporation Law § 34.04 n. 37 (7th ed. 2019). Unlike the fiduciary duty of loyalty, which can be eliminated under N.C.G.S. § 57D-3-21(b)(iii), the contractual obligation of good faith and fair dealing cannot be waived by the terms of an operating agreement and applies to all LLC member-manager actions. *See* N.C.G.S. § 57D-2-30(e).

60. Here, Key Marco was a party to the PHP Operating Agreement and unquestionably a member-manager of PHP. Accordingly, despite the PHP Operating

Agreement's waiver of its managers' fiduciary duty of loyalty, Key Marco is still subject to the contractual, implied covenant of good faith and fair dealing in carrying out the purposes of the PHP Operating Agreement.

61. Having determined that Key Marco continues to owe PHP the contractual obligation of good faith and fair dealing, the Court also concludes that the facts regarding Key Marco's breach of the implied duty of good faith are heavily disputed. Key Marco's participation in the diversion of the 2009 Motts Landing Contract from PHP to Communities may have been carried out with the intent to "wrongfully deprive" Plaintiff of "benefits to which [Plaintiff was] entitled," or for another "wrongful or unconscionable purpose," *Dull,* 85 N.C. App. at 318, 354 S.E.2d at 757, even if it did not breach the letter of the PHP Operating Agreement. *See also Maglione,* 168 N.C. App. at 56, 607 S.E.2d 286, 291 (2005) ("All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose.").

62. Whether Key Marco breached the covenant of good faith and fair dealing is a question better suited for the jury's determination. Therefore, to the extent the Defendants' Motion and the Plaintiff's Motion seek summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing against Key Marco, the Motions should be DENIED.

### iii. Ando & T. Ando Construction

63. Plaintiff also asserts claims against Ando for breach of fiduciary duty and constructive fraud based on Ando's fiduciary obligation as broker in charge for PHP. (ECF No. 3, at ¶¶ 90–97, 99–102.)

64. In North Carolina, a real estate broker has a "fiduciary duty to 'exercise reasonable care, skill, and diligence in the transaction of business entrusted to him, and he will be responsible to his principal for any loss resulting from his negligence in failing to do so.'" *Brown v. Roth*, 133 N.C. App. 52, 54, 514 S.E.2d 294, 296 (1999) (citation and quotation marks omitted); *Carver v. Lykes,* 262 N.C. 345, 354, 137 S.E.2d 139, 146, (1964) ("A real estate agent with whom property is listed for sale or exchange acts in a fiduciary capacity, if he accepts the proffered employment." (quotation omitted)).

65. The relationship between a real estate agent and his principle is akin to attorney-client relationships. *Starling v. Sproles,* 66 N.C. App. 653, 656, 311 S.E.2d 688, 690 (1984) ("a real estate broker and client have a measure of trust analogous to that of an attorney and his client; that the broker stands in a relation of trust and confidence" (citing *State v. Warren*, 252 N.C. 690, 114 S.E. 2d 660 (1960))). Accordingly, real estate brokers must "make a full and truthful disclosure [to the principal] of all facts known to him, or discoverable with reasonable diligence and likely to affect the principal." *Brown*, 133 N.C. App. at 54–55, 514 S.E.2d at 296 (citation and quotation marks omitted); *see also Spence v. Spaulding & Perkins, Ltd.*, 82 N.C. App. 665, 667, 347 S.E.2d 864, 865–66 (1986) ("A broker has the duty not to

conceal from his principals any material information and to make full, open disclosure of all such information."). Such a high level of trust is reposed in real estate agents, that a principal may rely on his agent's statements and is not required to make his own independent investigations. *Brown,* 133 N.C. App. at 55, 514 S.E.2d at 296.

66.     From July 2009 to at least the summer of 2015, T. Ando Construction acted as the sales manager and Ando acted as the broker-in-charge for PHP on the Motts Landing development. (Ando Dep., ECF No. 67.3, at pp. 19–21; ECF No. 62.14.) Accordingly, between July 2009 and sometime in the early summer of 2015, Ando and T. Ando Construction stood in a fiduciary relationship with PHP and owed the company the "obligation of [the] utmost fidelity and good faith." *Spence,* 82 N.C. App. at 667, 347 S.E.2d at 865 (citing James A. Webster, Real Estate Law in North Carolina, Sec. 131 (1981)). Having determined that Ando and T. Ando Construction owed PHP a fiduciary duty, the Court will now address Plaintiff's claims against Ando for breach of fiduciary duty and constructive fraud. Plaintiff's claims against Ando, T. Ando Construction, and Communities for fraud, tortious interference, and unjust enrichment will be addressed *infra.*

a)  Breach of Fiduciary Duty

67.     In its Fourth Cause of Action, Plaintiff alleges a claim against Ando for breach of fiduciary duty. (ECF No. 3, at ¶¶ 90–97.) Specific to Ando, Plaintiff alleges that "[b]y conspiring with Key Marco, Weinbach, and Communities to acquire PHP's business opportunities and causing Aftew to execute the Communities Contract while

serving as PHP's Broker in Charge . . . Ando breached his fiduciary duties of loyalty, good faith and fair dealing, and full disclosure to PHP." (ECF No. 3, at ¶ 96.)

68. Defendants argue that "Plaintiff's claim against Ando [for breach of fiduciary duty] is more accurately classified as a professional malpractice claim." (ECF No. 64, at .pdf p. 10 (citing *Apperson v. Intracoastal Realty Corp.,* No. COA18-147, 2018 N.C. App. LEXIS 929, at *4–5 (N.C. Ct. App. Sept. 18, 2018).) Accordingly, Defendants contend that Plaintiff's claim should fail because Plaintiff has not designated an expert to "provide opinion evidence on the proper standard of care" for a real estate agent in North Carolina. (*Id.*)

69. Plaintiff counters by arguing that Ando owed PHP fiduciary obligations as a matter of law and that Plaintiff's claim does "not focus upon [Ando's] 'malpractice,' but his breach of fiduciary duties to PHP while employed as its agent/Broker in Charge." (ECF No. 70, at p. 18.) Plaintiff contends that Defendants' Motion seeking summary judgment on Plaintiff's claim for breach of fiduciary duty against Ando should be denied because the evidence tends to show that Ando, while serving as PHP's real estate broker, "actively participated in conduct that was contrary to [PHP's] interests." (ECF No. 70, at p. 18.)

70. Under these facts, Defendants' argument that Plaintiff's breach of fiduciary duty claim is actually a "professional malpractice claim" is untenable for several reasons. First, the Court has already concluded that Ando owed PHP fiduciary duties as a matter of law by virtue of his status as the broker in charge for PHP. *See Cummings v. Carroll*, No. COA19-283, 2020 N.C. App. LEXIS 176, at **35–

36 (N.C. Ct. App. March 3, 2020) ("a real-estate agent's fiduciary duty is . . . imposed by operation of law"). Second, Plaintiff does not allege a claim against Ando for professional malpractice and instead chose to plead a claim for breach of fiduciary duty. (*See* ECF No. 3.) Third, Defendants have not cited, and the Court has not found, a North Carolina case involving a claim for breach of fiduciary duty against a real estate broker holding that the claimant must produce expert testimony to establish the standard of care to sustain such a claim. *See Cummings*, No. COA19-283, 2020 N.C. App. LEXIS 176, at **35–36; *Brown*, 133 N.C. App. at 54–56, 514 S.E.2d at 296–97; *see also Spence*, 82 N.C. App. at 668, 347 S.E.2d at 866 (In describing the evidence necessary to support a constructive fraud claim against a real estate agent the court held: "the only proof required to raise a jury issue and put the burden on the defendants to show that they acted openly, honestly and in good faith and took no advantage of plaintiffs is that (1) defendants were plaintiffs' agents in looking for a house to buy; (2) plaintiffs told defendants they wanted to buy the [seller's] house; (3) defendants later took title to the house and deeded it to plaintiffs; and (4) defendants did not obtain plaintiffs' informed consent to defendants' purchase from the [sellers] and defendants' sale to plaintiffs[.]").

71. Finally, Defendants' reliance on *Apperson v. Intracoastal Realty Corp.* is misguided. The *Apperson* court stopped short of holding that a "professional malpractice claim" can even be maintained against a real estate agent. *Apperson,* No. COA18-147, 2018 N.C. App. LEXIS 929, at *6 ("Plaintiffs allege that defendants, as real estate agents and thus members of a 'profession,' are subject to

professional malpractice. Even assuming *arguendo* that this is so, however, the burden is on plaintiffs to demonstrate that defendants breached a duty to plaintiffs, and that said breach proximately caused plaintiffs' damages."). Indeed, the Court cannot locate any North Carolina precedent definitively stating that real estate agents are subject to a claim styled as "professional malpractice."

72.     Based on the facts of this case and current North Carolina law, the Court concludes that Plaintiff's failure to proffer expert testimony establishing the standard of care for real estate agents, or Ando's breach of his fiduciary duty, is not detrimental to Plaintiff's claim. Moreover, the evidence shows that Ando took several actions, while still an agent of PHP, that could lead a reasonable jury to conclude that he breached his fiduciary duty to PHP. This evidence includes but is not limited to: Ando's participation in forming Communities for the purpose of diverting the 2009 Motts Landing Contract, Ando's participation in negotiating and procuring the Working Agreement, Ando's communication with Aftew's attorney regarding edits to the Third Amendment, Ando's participation in procuring and executing the Communities Contract, and Ando's failure to inform Klos about the Communities Contract. The question of whether Ando's actions amount to a breach of his fiduciary duties to PHP should be answered by a jury. Therefore, Defendants' Motion seeking summary judgment on Plaintiff's claim against Ando for breach of duty should be DENIED.

b) <u>Constructive Fraud</u>

73.    In its Fifth Cause of Action, Plaintiff asserts a claim against Ando for Constructive Fraud. (ECF No. 3, at ¶¶ 99–102.) Plaintiff alleges that Ando was in a position "of trust and confidence with PHP and took advantage of [that position] . . . to benefit [himself]." (ECF No. 3, at ¶ 100.)

74.    Defendants, grouping Ando with T. Ando Construction, Weinbach, and Key Marco together as the "Communities Defendants," argue that Plaintiff's constructive fraud claim should be dismissed because: "the Communities Defendants did not breach any duty to the Plaintiff. The Plaintiff is unable to satisfy the stated elements of constructive fraud." (ECF No. 64, at .pdf p. 11.)

75.    Plaintiff, in turn, fails to respond to Defendants' argument with any helpful legal analysis specific to its constructive fraud claim or to explain why Ando continued to owe and ultimately breached his fiduciary obligations to PHP. Instead Plaintiff only states that "a simple reading of Plaintiff's Complaint and the derivative claims contained therein show that Plaintiff's claims for Constructive Fruad . . . are limited to Defendants Key Marco, Weinbach and Ando." (ECF No. 70, at p. 19.)

76.    "To establish constructive fraud, a plaintiff must show that defendant (1) owes plaintiff a fiduciary duty; (2) breached this fiduciary duty; and (3) sought to benefit himself in the transaction." *Crumley & Assocs., P.C.,* 219 N.C. App. at 620, 730 S.E.2d at 767 (citing *Sullivan v. Mebane Packaging Grp.,* 158 N.C. App. 19, 32, 581 S.E.2d 452, 462, *disc. review denied,* 357 N.C. 511, 588 S.E.2d 473 (2003)). "After a *prima facie* case of constructive fraud is made out against a fiduciary by evidence

showing a course incompatible with his duty, the fiduciary has the burden of showing that he did not take advantage of his principal and acted throughout in a fair, open and honest manner." *Spence*, 82 N.C. App. at 667–68, 347 S.E.2d at 866 (citing *McNeil v. McNeil*, 223 N.C. 178, 25 S.E.2d 615 (1943)).

77.     The Court has already concluded that Ando, while acting as broker-in-charge, owed PHP fiduciary duties.  The Court has also determined that a jury should be afforded the opportunity to view the evidence and decide whether Ando's conduct amounts to a breach of his duties to PHP.  Likewise, the Court concludes that a reasonable jury, having viewed all the evidence, could determine that Ando sought to benefit himself, through his ownership stake in Communities, by engaging in the conduct at issue.  Therefore, Defendants' Motion seeking summary judgment on Plaintiff's claim against Ando for constructive fraud should be DENIED.

### D. Fraud

78.     In its Ninth Cause of Action, Plaintiff asserts a claim against Weinbach, Key Marco, Ando, T. Ando Construction, and Communities for fraud.  (ECF No. 3, at ¶¶ 116–27.)  "[T]he following essential elements of actionable fraud are well established: (1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Ragsdale v. Kennedy*, 286 N.C. 130, 138, 209 S.E.2d 494, 500 (1974); *Ward v. Fogel*, 237 N.C. App. 570, 581, 768 S.E.2d 292, 301 (2014).  Where a fiduciary relationship "exists between the parties, there is a duty to disclose all material facts, and failure to do so constitutes fraud." *Stamm v.*

*Salomon,* 144 N.C. App. 672, 680, 551 S.E.2d 152, 157–58 (2001) (quoting *Vail v. Vail,* 233 N.C. 109, 114, 63 S.E.2d 202, 205–06 (1951)) (internal quotation marks omitted).

i. Weinbach and Key Marco

79. Plaintiff contends that Weinbach and Key Marco, by virtue of their status as fiduciaries to PHP, each had a duty to disclose the nature of Communities and the Communities Contract and failed to do so. (ECF No. 62, at pp. 23–25.) The Court has already concluded that there is no evidence that Weinbach ever became a manager of PHP, and therefore, Weinbach does not owe any fiduciary duties to PHP. Accordingly, the record fails to support Plaintiff's contention that Weinbach had a duty to disclose the nature of Communities and the Communities contract to PHP.

80. Similarly, with regard to Key Marco, the Court has concluded that Article 7.1 waives the fiduciary duty of loyalty for PHP managers. While Key Marco continues to owe the duty of care to PHP, the duty to disclose is logically borne out of the fiduciary duty of loyalty. Accordingly, the PHP Operating Agreement waives any fiduciary duty that would require disclosure under these facts. Therefore, to the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claims for fraud against Weinbach and Key Marco, the Defendants' Motion should be GRANTED, and the Plaintiff's Motion should be DENIED.

ii. Communities

81. Plaintiff argues that "Communities clearly knew that the [Communities Contract] contained defects that it did not disclose to Aftew or PHP, including the representation that it amended a pre-existing contract with a different party." (ECF

No. 62, at p. 24.) Communities, as a party to the negotiation, clearly had intimate knowledge of the Communities Contract. However, Plaintiff fails to demonstrate how Communities would have a duty to disclose or to inform PHP about the Communities Contract. Additionally, Plaintiff fails to explain how it has standing to allege a claim for fraud against Communities on behalf of Aftew. Therefore, to the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claim for fraud against Communities, the Defendants' Motion should be GRANTED, and the Plaintiff's Motion should be DENIED.

### iii.   Ando and T. Ando Construction

82.   Plaintiff argues that Ando's position as PHP's broker in charge "clearly required Ando to inform PHP that he, T. Ando Construction, and Communities had taken steps to eliminate PHP's ability to sell and build on lots in Motts Landing." (ECF No. 62, at pp. 24–25.) Additionally, Plaintiff contends that "Ando and T. Ando Construction took affirmative steps to conceal the fact" that Communities was stepping into the shoes of PHP with regard to Motts Landing. (ECF No. 62, at p. 24.) Aside from advancing this argument to establish Ando and T. Ando Construction's duty to disclose, Plaintiff does not address or attempt to establish any additional element of its claim for fraud. (*See* ECF No. 62, at pp. 24–25.)

83.   In response, Defendants completely fail to address the fact that Ando owed PHP fiduciary duties. (ECF No. 67, at .pdf pp. 14–15; ECF No. 64, at .pdf pp. 12–13.) Defendants rely on inadmissible hearsay regarding conversations between Weinbach, Ando, and the PHP sales team to support their position that Ando and T.

Ando Construction did not take affirmative steps to conceal certain facts from PHP. (*See id.*) In addition to hearsay statements, to support their assertion that Klos was aware of Ando and T. Ando Construction's actions, Defendants also rely on, *inter alia,* the fact that Klos had a copy of the Communities Contract on September 29, 2015, and that Klos requested that his daughter remain employed with Communities during the wind-up of PHP. (*Id.*)

84. The Court has concluded that Ando and T. Ando Construction owed PHP fiduciary obligations and had a specific "duty not to conceal from [PHP] any material information and to make full, open disclosure of all such information." *Spence,* 82 N.C. App. at 667, 347 S.E.2d at 865–66. Ando freely admits that he did not disclose the nature of the Communities Contract to PHP's members other than Weinbach, that Klos never consented to the Communities Contract, and that Ando did not give Klos a copy of the Communities Contract prior to or near the time of its execution.

85. However, the record in this case is replete with issues of material fact that preclude an award of summary judgment to either party on Plaintiff's claims for fraud against Ando or T. Ando Construction. The evidence and testimony in the record are simply too inconsistent for the Court to be able to determine whether all elements of fraud are met. For example, the Court, having thoroughly reviewed the record, is unable to conclude what and when PHP learned about Communities and the Communities Contract, how material that information was to PHP, and to what extent, if any, PHP was actually deceived by the Defendants' alleged actions. Therefore, to the extent the Plaintiff's Motion and the Defendants' Motion seek

summary judgment on Plaintiff's claim for fraud against Ando and T. Ando Construction, the Motions should be DENIED.

### E. The Claim for Unjust Enrichment Should be Dismissed

86. In its Second Cause of Action, Plaintiff purports to bring a claim for unjust enrichment against Weinbach, Key Marco, Ando, T. Ando Construction, and Communities (collectively the "UE Defendants"). (ECF No. 3, at ¶¶ 75–80.) Plaintiff alleges that it conferred a benefit on UE Defendants "by establishing a buyer-seller relationship and goodwill with Aftew and performing under the resulting subsequent agreement . . . which [UE Defendants] accepted for themselves when inducing Aftew to execute the Communities Contract." (*Id*. at ¶ 77.) Plaintiff alleges it "would be unjust . . . for [UE Defendants] to retain the value of these benefits." (*Id*. at ¶ 79.) Defendants move for summary judgment on Plaintiff's claim for unjust enrichment, but Plaintiff does not seek summary judgment in its favor on this claim.

87. A claim for unjust enrichment "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988). "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atlantic C. L. R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95–96, 150 S.E.2d 70, 73 (1966) (citations omitted). In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit;

and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206 (2002). "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761 (1984).

88.     Based on the undisputed material facts, Defendants are entitled to judgment as a matter of law on Plaintiff's claim for unjust enrichment. First, although Plaintiff alleges that it "conferred" the goodwill developed from its relationship with Aftew on the UE Defendants, the facts in the record do not support the allegation. Instead, it is undisputed that the UE Defendants took any benefit of Plaintiff's goodwill when it entered into the Communities Contract. In fact, Plaintiff claims that it did not know that UE Defendants had secured the Communities Contract until many months after it was executed. Therefore, Plaintiff could not have consciously conferred any benefit on UE Defendants.

89.     As this Court recently held:

> Alleging merely that the Defendants have taken for themselves some benefit to which Plaintiff believes it is rightfully entitled does not state a claim for unjust enrichment. Rather, a claim for unjust enrichment must be based on a contract implied in law in which one party has provided a benefit to another, such as goods or services, for which the first party should rightfully be compensated. [Plaintiff] does not allege that it conferred a benefit on Defendants; only that Defendants violated its rights and

thereby obtained some benefit to themselves for which [Plaintiff] believes it should be awarded damages.

*KNC Techs., LLC v. Tutton*, 2019 NCBC LEXIS 72, at *36–37 (N.C. Super. Ct., Oct. 9, 2019) (citing *Chisum v. Campagna*, 2017 NCBC LEXIS 102, at *31–32 (NC Super. Ct. Nov. 7, 2017) (unjust enrichment claim dismissed where plaintiff did "not allege that he conferred any benefit on the [defendants], but rather only that the [defendants] 'received' or 'wrongfully retained' benefits from their alleged misconduct."); *see also Islet Scis., Inc. v. Brighthaven Ventures*, LLC, 2017 NCBC LEXIS 4, at *15–18 (N.C. Super. Ct. Jan. 12, 2017) (unjust enrichment claim failed where plaintiff alleged only that it was damaged by defendants' conduct and not that it had conferred a benefit on defendant company).

90.    Plaintiff presents no evidence that it conferred its goodwill on UE Defendants, but only evidence that they may have benefitted by taking the goodwill. Accordingly, UE Defendants are entitled to judgment as a matter of law. Therefore, Defendants' Motion seeking summary judgment on Plaintiff's claim for unjust enrichment should be GRANTED.

### F. Interference with Contract and Prospective Economic Advantage

91.    Both Plaintiff and Defendants seek summary judgment on Plaintiff's Third Cause of Action for tortious interference with contract and with prospective economic advantage. Plaintiff alleges that Key Marco, Weinbach, Ando, T. Ando Construction, and Communities (collectively the "TI Defendants") wrongfully interfered with the 2009 Motts Landing Contract and prevented Plaintiff from continuing to extend its contract with Aftew. (ECF No. 3, at ¶¶ 81–88.) Plaintiff

alleges that it had a contract with Aftew "prior to July 1, 2015" and "had a reasonable expectation of the renewal of the [contract]." (*Id.* at ¶ 82.) Plaintiff contends the TI Defendants "maliciously induced Aftew not to renew, extend or amend any agreement with PHP and instead [to] enter into a new contract with Communities under the pretense that it was merely an extension and amendment of the previous agreements with PHP." (*Id.* at ¶ 85.)

92. To establish a claim for tortious interference with contract, Plaintiff must produce evidence of: "(1) a valid contract between the [claimant] and a third person, conferring upon the plaintiff a contractual right against the third person; (2) the [opposing party] knows of the contract; (3) the [opposing party] intentionally induces the third person not to perform the contract; (4) the [opposing party] acts without justification; and (5) the [opposing party's] conduct causes actual pecuniary harm to the plaintiffs." *Pinewood Homes, Inc. v. Harris*, 184 N.C. App. 597, 604, 646 S.E.2d 826, 832 (2007). "Generally speaking, interference with contract is justified if it is motivated by a legitimate business purpose, as when the plaintiff and the defendant, an outsider, are competitors." *Embree Constr. Grp., Inc. v. Rafcor, Inc.*, 330 N.C. 487, 498, 411 S.E.2d 916, 924 (1992). If the defendant's interference is "for a legitimate business purpose, his actions are privileged . . . . [C]ompetition in business constitutes justifiable interference in another's business relations and is not actionable so long as it is carried on in furtherance of one's own interests and by means that are lawful." *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988). This "privilege [to interfere] is conditional or qualified; that

is, it is lost if exercised for a wrong purpose.  In general, a wrong purpose exists where the act is done other than as a reasonable and *bona fide* attempt to protect the interest of the defendant which is involved." *Id.* at 220, 367 S.E.2d at 650 (citations omitted).  "If the defendant's only motive is a malicious wish to injure the plaintiff, his actions are not justified." *Id.* at 221, 367 S.E.2d at 650; *Alcorn v. Bland*, 224 N.C. App. 397, 2012 N.C. App. LEXIS 1416, at *21 (Dec. 18, 2012) ("Interference is without justification if it is 'malicious and wanton[.]'")

93.     The tort of interference with prospective economic advantage "arises when a party interferes with a business relationship by maliciously inducing a person not to enter into a contract with a third person, which he would have entered into but for the interference, . . . if damage proximately ensues, when this interference is done not in the legitimate exercise of the interfering person's rights." *Beverage Sys. of the Carolinas, LLC v. Associated Bev. Repair, LLC*, 368 N.C. 693, 701, 784 S.E.2d 457, 463 (2016) (ellipses in original, internal quotation marks and citations omitted). "However, a plaintiff's mere expectation of a continuing business relationship is insufficient to establish such a claim.  Instead, a plaintiff must produce evidence that a contract would have resulted but for a defendant's malicious intervention." *Id.*

94.     "[T]o state a claim for wrongful interference with prospective advantage, the plaintiffs must allege facts to show that the defendants acted without justification in inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference." *Gupton v. Son-Lan Dev. Co.*, 205 N.C. App. 133, 142–43, 695 S.E.2d 763, 770 (2010) (quoting *Walker v. Sloan,* 137

N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000)). "[U]nlawful interference with the freedom of contract is actionable, whether it consists in maliciously procuring breach of a contract, or in preventing the making of a contract when this is done, not in the legitimate exercise of the defendant's own rights, but with design to injure the plaintiff, or gaining some advantage at his expense." *Id.* at 205 N.C. App. at 143, 695 S.E.2d at 770 (quoting *Coleman v. Whisnant,* 225 N.C. 494, 506, 35 S.E.2d 656 (1945)).

95.     For tortious interference claims, North Carolina distinguishes between outsiders and non-outsiders to the transaction. Non-outsiders are those who, while not a party to the contract or the prospective contract, have a legitimate business interest in the subject matter. *Smith v. Ford Motor Co.*, 289 N.C. 71, 87, 221 S.E.2d 282, 292 (1976). A non-outsider enjoys qualified immunity from liability on a tortious interference claim. *Combs v. City Elec. Supply Co.*, 203 N.C. App. 75, 84, 690 S.E.2d 719, 725 (2010). A non-outsider loses this qualified immunity if the non-outsider acts with "legal malice." *Varner v. Bryan*, 113 N.C. App. 697, 702, 440 S.E.2d 295, 298 (1994). "A person acts with legal malice if he does a wrongful act or exceeds his legal right or authority in order to prevent the continuation of the contract between the parties." *Id.*

96.     The parties dispute whether the TI Defendants are outsiders or non-outsiders. Non-outsiders include "[o]fficers, directors, shareholders, and other corporate fiduciaries." *Embree*, 330 N.C. at 498, 411 S.E.2d at 924. "Individuals who hold those positions have a qualified privilege to interfere with contractual relations

between the corporation and a third party." *Id.* (internal quotation omitted); *see also Palles v. Hatteras Inv. Partners LLC*, 2009 NCBC LEXIS 37, at *15 (N.C. Super. Ct. July 27, 2009) ("[A] party to a contract, including the party's managing agent, cannot be liable for wrongful interference of the contract."). In addition, this Court has held that a real estate broker representing one of the defendants in lease negotiations is a non-outsider to the transaction. *Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at *22–24 (N.C. Super. Ct. Dec. 12, 2016) (citing *Rhodes, Inc. v. Morrow*, 937 F. Supp. 1202, 1216 (M.D.N.C. 1996)) (holding that an attorney, as a representative of the client, was a non-outsider with respect to transactions on which the attorney advised the client).

97.     The Court concludes that the undisputed facts establish that Key Marco, Weinbach, Ando, and T. Ando Construction are non-outsiders to the 2009 Motts Landing Contract, and to the prospective continuing relationship between PHP and Aftew. Key Marco is a member of PHP, a party to the agreement, and Weinbach was designated as Key Marco's representative and is Key Marco's sole officer. *Embree*, 330 N.C. at 498, 411 S.E.2d at 924; *Palles*, 2009 NCBC LEXIS 37, at *15. Ando and T. Ando Construction, as the real estate broker responsible for selling the houses constructed under the 2009 Motts Landing Contract also are non-outsiders. *Remi Holdings, LLC*, 2016 NCBC LEXIS 110, at *22–24. Therefore, in order to establish a claim for tortious interference Plaintiff must present evidence that each of them acted with legal malice.

98. The facts regarding whether Key Marco, Weinbach, Ando, and T. Ando Construction acted with legal malice are disputed. Accordingly, to the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claims for tortious interference with contract and with prospective economic advantage against Weinbach, Key Marco, Ando, and T. Ando Construction, the Motions should be DENIED.

99. On the other hand, Communities is an outsider to the 2009 Motts Landing Contract and to the relationship between PHP and Aftew. Defendants make no separate argument regarding Communities' right to summary judgment on the tortious interference claims. The Court concludes that material issues of fact regarding, *inter alia*, whether Communities was a competitor of PHP and whether its interference was justified, are in dispute. Therefore, to the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claims for tortious interference with contract and with prospective economic advantage against Communities, the Motions should be DENIED.

### G. Civil Conspiracy

100. Plaintiff also makes a claim for civil conspiracy against all Defendants. (ECF No. 3, at ¶¶ 131–35.) Plaintiff alleges that "there existed an agreement between Ando, T. Ando Construction, Weinbach, Key Marco, and Communities to divert business opportunities from PHP to Communities by unlawful acts or by lawful acts performed in an unlawful way[.]" (*Id*. at ¶ 132.) Plaintiff and Defendants purport to

seek summary judgment on the claim for civil conspiracy, but neither provides any substantive argument in support of their respective positions.

101. To plead a civil conspiracy, a plaintiff must allege: "(1) An agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Piraino Bros., LLC v. Atlantic Fin. Grp., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333 (2011). The Court concludes that, at a minimum, there are disputed issues of material fact regarding the lawful or unlawful nature of much of the conduct underlying the alleged wrongful acts that preclude summary judgment for either party at this time. Accordingly, to the extent the Plaintiff's Motion and the Defendants' Motion seek summary on Plaintiff's claim for civil conspiracy, the Motions should be DENIED.

## H. Plaintiff's Motion Seeking Summary Judgment as to The Amount of PHP's Damages Is Premature

102. Plaintiff argues that the undisputed evidence shows that the "contracts and opportunities assumed by Communities include the marketing and development of all lots in Motts Landing." (ECF No. 62, at p. 27.) Plaintiff further contends that its expert, Dr. Farinella, has provided the only opinion on PHP's damages and that Defendants have not challenged Dr. Farinella's assessment. (*Id.*) Accordingly, based on Dr. Farinella's opinion, Plaintiff seeks summary judgment on the damages owed to PHP in the amount of $6,753,389 "as a result of the Defendants' liability for the claims [analyzed above]." (*Id.*)

103. Defendants argue that adopting Dr. Farinella's report is premature because Dr. Farinella has not been admitted as an expert or cross-examined regarding his opinion. (ECF No. 67, at p. 17.) Moreover, Defendants raise several issues regarding inaccuracies in Dr. Farinella's opinion. (*Id.*)

104. The Court concludes that adopting Dr. Farinella's opinion, at this stage in the litigation, is premature. As discussed above, the Court has not granted summary judgment in favor of Plaintiff on any of its claims. Because no liability has been established on the part of any Defendant, the Court cannot say as a matter of law that PHP is entitled damages in the amount of $6,753,389. Moreover, despite Plaintiff's declarations regarding Dr. Farinella's fitness as an expert and adherence to North Carolina Rules of Evidence 702(a)[5] in proffering his opinion, the Court has not yet admitted Dr. Farinella as an expert. Finally, should Dr. Farinella be admitted as an expert under N.C.G.S. § 8C-1, Rule 702(a), the Defendants should be afforded the opportunity to challenge Dr. Farinella's expert opinion on cross-examination. For all these reasons, the Court's adoption of Dr. Farinella's report and opinion would be premature.

105. Therefore, to the extent the Plaintiff's Motion seeks to have the Court adopt Dr. Farinella's expert report and opinion and grant summary judgment to Plaintiff on the issue of damages, Plaintiff's Motion should be DENIED.

---

[5] Rule 702(a) of the North Carolina Rules of Evidence mandates that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply: (1) The testimony is based upon sufficient facts or data; (2) The testimony is the product of reliable principles and methods; and (3) The witness has applied the principles and methods reliably to the facts of the case." N.C.G.S. § 8C-1, Rule 702(a)(1)–(3).

## IV.   CONCLUSION

THEREFORE, IT IS ORDERD that:

1. CSMC, Alpat, and Aftew are DISMISSED from this action WITHOUT PREJUDICE.

2. To the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claims for breach of fiduciary duty and constructive fraud against Weinbach and Key Marco, the Defendants' Motion is GRANTED, and the Plaintiff's Motion is DENIED.

3. To the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claim against Weinbach for breach of the implied covenant of good faith and fair dealing, the Defendants' Motion is GRANTED, and the Plaintiff's Motion is DENIED.

4. To the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claim for breach of the covenant of good faith and fair dealing against Key Marco, the Motions are DENIED.

5. To the extent the Defendants' Motion seeks summary judgment on Plaintiff's claims against Ando for breach of duty and constructive fraud, the Defendants' Motion is DENIED.

6. To the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claim for fraud against Weinbach, Key

Marco, and Communities, the Defendants' Motion is GRANTED, and the Plaintiff's Motion is DENIED.

7. To the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claim for fraud against Ando and T. Ando Construction, the Motions are DENIED.

8. To the extent the Defendants' Motion seeks summary judgment on Plaintiff's claim for unjust enrichment, the Defendants' Motion is GRANTED.

9. To the extent the Plaintiff's Motion and the Defendants' Motion seek summary judgment on Plaintiff's claims for tortious interference with contract and with prospective economic advantage, the Motions are DENIED.

10. To the extent the Plaintiff's Motion and the Defendants' Motion seek summary on Plaintiff's claim for civil conspiracy, the Motions are DENIED.

11. To the extent the Plaintiff's Motion seeks to have the Court adopt Dr. Farinella's expert report and opinion, the Plaintiff's Motion is DENIED.

12. To the extent the Defendants' Motion seeks summary judgment on Plaintiff's claims for an Accounting, Judicial Dissolution, and Piercing the Corporate Veil, the Defendants' Motion is DENIED.

13. Except as specifically GRANTED herein, the Motions are DENIED.

SO ORDERED, this the 21st day of July, 2020.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases